A. P. Steckel v. Commissioner.
Steckel v. Comm'r
Docket Nos. 1935, 2762. United States Tax Court
1944 Tax Ct. Memo LEXIS 104; 3 T.C.M. (CCH) 996; T.C.M. (RIA) 44308; September 28, 1944
*104 Eugene E. Anderson, Esq., for the petitioner. Lawrence R. Bloomenthal, Esq., for the respondent. HILL Memorandum Findings of Fact and Opinion HILL, Judge: These proceedings have been consolidated by stipulation of the parties. Docket N3. 1935 involves income tax deficiency for the year 1940 in the sum of $113,911.99, and Docket No. 2762 involves gift tax deficiencies for the years 1940 and 1941 in the amounts of $18,214.35 and $175,535.25, respectively. In each case petitioner avers that an overpayment has been made. In Docket No. 1935 certain adjustments to petitioner's income made by the respondent have been conceded. The remaining issues are whether the income of a trust created by the petitioner in September 1940 is taxable to him under sections 22 (a), 166 or 167 of the Internal Revenue Code, and whether petitioner is entitled to the benefits of section 107 of the Internal Revenue Code in computing his income tax for the year 1940. In Docket No. 2762 the sole question is the value of shares of Cold Metal Process Company disposed of by petitioner during 1940 and 1941. The cases were heard on a stipulation of facts, oral evidence on behalf of both parties, and on documentary *105 evidence. The facts stipulated and not set forth below are included in our findings of fact by reference. Findings of Fact Petitioner is an individual residing in Cleveland, Ohio. His income tax return for 1940 and his gift tax returns for 1940 and 1941 were filed with the collector for the 18th district of Ohio. Petitioner is a graduate engineer and an inventor. In 1923 he made application for patents on "metal rolling" and "method and apparatus for rolling thin sheet-like material". On January 14, 1930, patent number 1,744,016 was issued to petitioner on the metal rolling application and on October 21, 1930, patent number 1,779,195 was issued on the other. These patents expire January 14, 1947, and October 21, 1947, respectively. In 1926, Cold Metal Process Company, hereinafter referred to as Process Company, was organized by petitioner to exploit these patents, The total number of authorized shares was 2,000 and petitioner received 420 shares in exchange for the assignment of his patent applications. Petitioner served as president of the Process Company until 1933 when he was succeeded by L. A. Beeghly. At that time Messrs. Beeghly, Bliss and Kilcawley of Standard Slag Company *106 had acquired financial control of the Process Company. Since that time petitioner has served as a director and devoted his entire time to protecting his interests in the company. At the time petitioner was succeeded by Beeghly as president he became involved in a series of disputes with Beeghly, Bliss and Kilcawley over the conduct of the affairs of the Process Company. Petitioner, representing the minority interests of the company, contended that the assets of the Process Company were being dissipated by their actions. This state of affairs lasted until August 1940. In October 1936, petitioner was in financial difficuities due in part to his long drawn out feud with the majority interests of the Process Company. On October 20, 1936, petitioner sold 21 shares of his Process Company stock at $350 to the following people: John F. Cantwell, A. M. Rosenblum, Jos. N. Trainor, Wm. Nash, W. I. Lourie, Isabel G. Lourie, Babette H. Ash, F. J. Bierkamp, John Garvy, and F. M. Kirwin. Petitioner did not wish to cause these shares to be transferred on the books of the company because he did not want to reveal his weakened financial condition to the majority interests thereof. These purchasers *107 had complete confidence in the honesty and business judgment of petitioner and were content to let the stock remain in his name if their interests could be protected. Therefore, on October 23, 1936, petitioner executed an agreement with the Peoples-Pittsburgh Trust Company of Pittsburgh, Pa., as agent, whereby he deposited a certificate representing his 420 shares of Process Company stock, duly endorsed, to hold the same in block for himself and the purchasers of the 21 shares. The agent issued certificates to the petitioner and each of the purchasers, stating the number of such shares held for each of them. Petitioner voted it as he wished and he also could control any sales. When petitioner recovered the dividends on the stock he paid over to the purchasers their share of the dividends. Each buyer treated the stock as his own for tax purposes. This agreement remained in force during the taxable years in question. As soon as the patents were issued the Process Company served infringement notices on various steel companies and in 1934 filed suit in the District Court of the United States for New Jersey against the Carnegle-Illinois Steel Company, a subsidiary of the United States *108 Steel Company, claiming that the Steckel patents were infringed. On June 15, 1939, the Circuit Court of Appeals for the Third Circuit upheld the validity of the Steckel patents in this case. A petition for rehearing was denied November 14, 1939, and on February 26, 1940, the Supreme Court of the United States denied certiorari. On August 30, 1940, the Process Company entered into a settlement and license agreement with Carnegie-Illinois Steel Company whereby the latter paid to Process Company $3,850,000 and contracted to pay a minimum royalty for the future of $1,000,000. The settlement also provided that other steel companies would have the opportunity to secure licenses for use of these patents and settle claims on the same terms until March 1, 1941. Only two relatively small steel companies took advantage of the offer of settlement. On September 20, 1940, the Circuit Court of Appeals for the Third Circuit entered an order vacating its opinion of June 15, 1939, in the Carnegie-Illinois Steel Company case and remanded the proceedings to the District Court of New Jersey with directions to dismiss the bills of complaint as to the Steckel patents on the ground that cause was moot. *109 On September 24, 1940, petitioner executed a trust agreement with the Central National Bank of Cleveland, Ohio, and deposited 120 shares of his Process Company stock in trust. Salient features of the trust agreement are set out below: "RIGHTS OF GRANTOR TO CONTROL SALES AND INVESTMENTS "So long as the grantor shall live, no sale or investment of the trust estate shall be made unless he shall have directed the same in writing, it being understood that he may at any time, while living, direct any such sale or investment without being subject with respect thereto to any restriction or limitation whatsoever imposed on the trustee by this instrument or by law. The trustee shall not be responsible for any loss that may be incurred by reason of any purchase made or anything done with the written approval of the grantor or at his direction in writing. "RIGHTS OF GRANTOR TO AMEND OR MODIFY TERMS OR ADD OTHER PROPERTY The grantor shall have the right from time to time, by written notice delivered to the trustee, to amend or modify this agreement only with respect to the beneficiaries and their shares, by altering the proportions or amount of income to be paid to or applied to the use of *110 any of the beneficiaries, or directing distribution of any part thereof to the issue or spouse of any beneficiary, by altering the proportions or amount of net assets of the trust estate to be distributed on the termination of the trust to any of the beneficiaries or the issue or spouse of any beneficiary, by cancelling any benefaction to any of the beneficiaries and re-distributing it among, the others or the issue or spouse of any of the original beneficiaries; provided, however, that in no event shall any such modification or alteration direct that the said income or any assets of the trust estate be paid to or applied to the use or benefit of the grantor. * * * * *
"TERMINATION OF THE TRUST "The death of the grantor shall immediately terminate this trust, or the grantor may at any time terminate it by giving written notice of an intention so to do. If the grantor shall die or give such notice to the trustee herein named, or to any of its successors, said trust shall immediately cease, and the estate in the hands of the trustee, after deducting its compensation and all reasonable obligations incurred by it in the management of said estate, but without warranty by or recourse *111 on it, shall, upon tender to it of a receipt in full, be delivered or conveyed to the beneficiaries who at the time of the termination of the trust were entitled to distribution of the income designated in the same proportions in which they were entitled to such distribution of income, subject to modification by the grantor as hereinabove provided, and upon such delivery or conveyance the trustee shall be relieved from all liability herein; provided, that the grantor shall not in any case nor to any extent become a beneficiary. "DISPOSITION OF INCOME "For the purpose of this trust all dividends except those payable in stock of the declaring company shall be treated and distributed as income. Out of the income or principal, as it deems best, the trustee may pay all taxes that may be imposed upon the trust estate, the income thereof or the succession thereto. It shall also in like manner pay all expenses or obligations incurred by it in the management and preservation of the estate, and its own compensation as hereinafter provided. The entire net income then remaining shall be paid from time to time, as soon as practicable after its receipt by the trustee, to the following beneficiaries *112 in the proportions stated so long as they shall live, namely: Two-thirds of such net income to Martha B. Steckel, 397 Redonda Rd., Youngstown, Ohio. One-sixth of such net income to Barbara Ann Steckel, 397 Redonda Rd., Youngstown, Ohio. One-sixth of such net income to Frederick R. Steckel, 2505 Lorain Rd., San Marino, Calif.
"In the event of the death of any of the beneficiaries above named during the continuance of the trust, leaving issue, the share which would have been distributable to such beneficiary if he or she had survived shall be distributed among such issue per stirpes and not per capita. In the event of the death of any of the above named beneficiaries leaving no issue surviving, the share of income which would have been payable to such beneficiary if living, shall be distributed among the surviving beneficiaries or their surviving issue, in the proportions in which they were entitled to share in such income prior to the death of such deceased beneficiary. All distribution shall be subject, however, to the right hereinbefore reserved to the grantor to change beneficiaries from time to time." The beneficiaries named under this trust were petitioner's *113 elderly sister, his son and his daughter. The son was married and living in California at the time. The daughter was of age and is now married, but made her home with petitioner on the date the trust was created. At that time she was employed and earning. Petitioner's sister also made her home with him. At the outset petitioner's sister was to receive two-thirds of the trust income and the son and daughter one-sixth, respectively. Later petitioner changed this so that his sister received one-fifth of the income and his son and daughter two-fifths, each. Still later their shares were modified so that each beneficiary received a one-third interest. The Central National Bank as trustee under the trust agreement received a total of $159,000 in dividends in 1940 on the 120 shares of Process Company stock. On September 25, 1940, the first dividend of $500 a share was paid. This dividend was distributed two-thirds to petitioner's sister and one-sixth each to his children. In December, 1940, an additional dividend of $825 a share was paid and by direction of petitioner was distributed one-fifth to the sister and two-fifths each to the children. The money received by petitioner from the Process *114 Company as dividends on his stock was not compensation for his services. On January 12, 1940, petitioner sold three shares of his Process Company stock at a price of $500 per share, subject to the terms of the above-mentioned agreement of October 23, 1936, except that in the event the stock should be resold at a price in excess of $500 per share, petitioner was to receive one-half of such excess. The purchaser was to receive all dividends on the stock. On May 21, 1940, petitioner sold 6 additional shares on the same terms and on August 22, 1940, 4 additional shares were sold on the same terms. On September 9, 1940, L. A. Beeghly, W. E. Bliss and W. H. Kilcawley sold 40 shares of the Process Company stock to Standard Slag Company at a price of $7,600 a share. At the time of these sales, Beeghly, Bliss and Kilcawley owned 75 percent of the stock of Standard Slag Company and occupied the positions of president, vice-president and secretary-treasurer of that company, respectively. On August 31, 1940, Beeghly and Kilcawley were indebted to Standard Slag Company in the sums of $98,332.84 and $62,425.99. respectively. On September 20, 1940, the debts were repaid. Beeghly, Bliss and Kilcawley *115 controlled Standard Slag Company and the sale above mentioned was not an arm's length transaction. There were no other sales of Process Company stock during the period 1940 through 1941. The stock was not listed on any exchange and was not traded in as over-the-counter stock. In mid-October 1940, petitioner offered to sell certain of his shares to Beeghly, Bliss and Kilcawley or their nominees at a price of $4,000 a share. The offer was rejected. On September 24, 1940, petitioner made 12 gifts of 1 share each of his Process Company stock to 12 different individuals. In addition, in September 1940, petitioner gave 1 share to Ernest M. Hill of Buffalo, New York, and in December gave another share to the same individual. On March 15, 1941, petitioner filed his gift tax return reporting a gift of 2 shares of Process Company stock to Ernest M. Hill of Buffalo, New York, and placing thereon a value of $4,000 a share. He reported no tax due. On or about the same date he filed his income tax return and claimed a deduction of $61,000 for attorney's fees. In a statement attached to this return, petitioner stated that he had delivered a certificate of 15 shares of Process Company stock to *116 a firm of attorneys in payment of their services and declared that the fair market value of the stock was $4,000 a share. The December dividends on these shares were paid to the attorneys. In November 1941, petitioner filed an amended return reporting that the attorneys had refused this payment for their services and that they returned the dividends received by them on this stock. On December 24, 1941, petitioner gave 20 shares of Process Company stock to Lucy Steckel, and 2 shares to the Lehigh County Historical Society of Allentown, Pa.
On December 29, 1941, petitioner dissolved the trust created in September 1940, and directed that the principal of the trust, 120 shares of Process Company stock be distributed to the beneficiaries equally. This was done. Such dissolution and distribution constituted a gift by petitioner of 40 shares of the Process Company stock to each of the three named beneficiaries. On March 16, 1942, petitioner filed his gift tax return reporting these gifts and placed a value on the stock of $2,000 a share, computing his tax at $32,505. No dividends were paid by the Process Company until after the settlement with Carnegie-Illinois Steel Company in August *117 1940. In 1940 the dividend amounted to $1,325 a share. In 1941 the dividend totalled $700 a share, and in 1942, $225 a share. On December 31, 1940, and December 31, 1941, the liabilities of the Process Company exceeded its current assets. The balance sheets of the Process Company as of December 31, 1940, and December 31, 1941, are as follows: ASSETS
Dec. 31, 1940
Dec. 31, 1941
Cash
$ 265,683.84
$ 142,144.15
Accounts Receivable
2,235,844.73
332,651.29
Inventory
321,464.15
Total Current
$2,822,992.72
$ 474,795.44
Other Assets
11,744.15
7,159.16
The Cold Metals Products Co.
1,406,625.48
Patents
At cost
$729,740.57
$555,673.46
Allowance for amortiza-
tion
397,229.00
307,000.45
Net Book Value
332,511.57
248,673.01
Permanent
Land, Bldgs., Mach.,
Equip., etc. at cost
637,905.34
Allowance for deprecia-
tion
120,863.49
Net Book Value
517,041.85
49,389.00
Deferred
28,483.07
$3,714,773.36
$2,186,642.09
LIABILITIES
Notes Payable
$1,450,000.00
$ 700,000.00
Accounts Payable
472,565.25
88,729.53
Accrued Taxes, etc.
1,068,852.43
714,716.10
Total Current
$2,991,417.68
$1,503,445.63
Reserve for Contingencies
200,000.00
200,000.00
Capital Advance
Nominal - Capital Stock
$ 30,000.00
$ 30,000.00
Surplus - Paid-in
70,000.00
70,000.00
Profit and Loss
421,355.68
383,196.46
Total Nominal
521,355.68
483,196.46
$3,714,773.36
$2,186,642.09
*118 On September 17, 1942, the Union National Bank acting for W. E. Bliss sold to Standard Slag Company 1 share of Process Company stock at a price of $5,000 a share. On December 31, 1942, Beeghly, Bliss and Kilcawley sold to Standard Slag Company 19 shares of the Process Company stock at a price of $5,000 per share. In determining the gift tax deficiency for the year 1940, respondent determined the value of the Process Company stock to be $7,600 a share, based upon the sale by Beeghly, Bliss and Kilcawley to Standard Slag Company on September 9, 1940. In determining the gift tax deficiency for 1941, respondent used the same value less the dividend of $1,325 paid in 1940, or a value of $6,275 a share. The value of the Process Company stock on the date of the gifts in September 1940 was $4,000 a share, and on the date of the gift in December 1940 was $4,000. The value of the Process Company stock in December 1941 was $2,000 a share. Opinion In Docket No. 1935, respondent determined an income tax deficiency of $113,911.99. Certain minor adjustments have been conceded by petitioner. The other issues are whether the income of the trust created September 24, 1940, is taxable to petitioner, *119 and whether petitioner is entitled to compute his income tax for 1940 pursuant to section 107 of the Internal Revenue Code. In Docket No. 1935 the respondent determined that the trust created by petitioner on September 24, 1940, lacked substance and that the income of the trust amounting to $159,000 was taxable to petitioner. In respondent's notice of deficiency he stated, without elaboration, that the income of the trust was taxable to petitioner under sections 22 (a), 166 and 167 of the Internal Revenue Code. In his brief, however, he appears to have abandoned the theory that the income is taxable under sections 166 and 167 and proceeds solely on the ground that it is taxable to petitioner under section 22 (a). Petitioner flatly stated that sections 166 and 167 are not controlling, and that if taxable under any theory it is under section 22 (a). It is obvious that such income is not taxable to petitioner under section 166 or section 167. Was the income taxable to petitioner under section 22 (a)? [1]
*120 Respondent argues that the trust is a sham and that after the trust was created petitioner retained such control over the trust income and the trust estate that he remained the actual owner hereof; that this control reserved by petitioner brings the case squarely within the rule of Helvering v. Clifford, 309 U.S. 331. Buck v. Commissioner, 120 Fed. (2d) 775; Charles F. Roeser, 2 T.C. 298. Petitioner contends contra. The decision of the Supreme Court in Helvering v. Clifford, supra, has been responsible for a "flood" of cases involving the taxability of trust income. Each of these was decided on its own facts and in each the court was careful to limit its decision in that respect. It would serve no useful purpose to analyze the cases cited in the briefs as supporting their respective contentions. "While no one fact may be decisive in determining the question of ownership for tax purposes, the dominant fact is the extent of the donor's actual control." Charles F. Roeser, supra. It is the whole bundle of retained rights that *121 must be examined to determine the identity of the owner of the trust property. Helvering v. Clifford, supra. The provisions of the trust instrument before us reserving to petitioner the right to control the administration and disposition of the trust corpus, to distribute the trust income and the trust estate to the named beneficiaries or others as he desired, coupled with his right to terminate the trust at any time are, in our opinion, the retention of a sufficient bundle of rights in the trust property to sustain the respondent's determination. It is true that no part of the income or corpus could be used to benefit petitioner. The fact remains, however, that the named beneficiaries of this trust had no vested rights in the trust income or in the trust estate. In Lorenz Iversen, 3 T.C. 756, at 769, we said: Petitioner had absolute and exclusive control over all distributions of trust income. None of the beneficiaries could receive any distribution from the trusts during his lifetime except as he directed. He had the right to terminate the trusts at any time and to have any or all of the principal distributed to the *122 beneficiaries. He had the right to control all investments of trust funds. * * * In that case we held that the trust income was taxable to the settlor. We hold likewise here. Helvering v. Clifford, supra; Commissioner v. Buck, supra; Charles F. Roeser, supra. Cf. Louis Stockstrom, 3 T.C. 255, and Estate of Bertha Stockstrom, Deceased, 4 T.C. 5. The second point raised by the petitioner is that he has overpaid his income tax for 1940. He contends that the dividends received by him from the Process Company were actually compensation for services and as such he earned them over a period from 1923, when the applications for patents were filed, until 1930, when the patents were issued. He insists that this entitles him to the relief benefits provided under section 107 of the Internal Revenue Code. That section provides as follows: SEC. 107. COMPENSATION FOR SERVICES RENDERED FOR A PERIOD OF FIVE YEARS OR MORE. In the case of compensation (a) received, for personal services rendered by an individual in his individual capacity, or as a member of a partnership, and *123 covering a period of five calendar years or more from the beginning to the completion of such services, (b) paid (or not less than 95 per centum of which is paid) only on completion of such services, and (c) required to be included in gross income of such individual for any taxable year beginning after December 31, 1938, the tax attributable to such compensation shall not be greater than the aggregate of the taxes attributable to such compensation had it been received in equal portions in each of the years included in such period. We have found that the sums of money received by petitioner in 1940 from the Process Company were paid to him as dividends and not as compensation for services. The money so received by petitioner was paid as dividends on corporate stock which represented an investment. It is clear that no part of it was received as compensation for services within the meaning of section 107. Hence, that section has no application. The claim of overpayment is, therefore, denied. In Docket No. 2762 we are concerned with the value of Cold Metal Process Company stock during 1940 and 1941. The respondent determined a gift tax deficiency for 1940 of $18,214.25. In his notice *124 of deficiency respondent advised petitioner that his gift tax return showed gifts of 2 shares of Process Company stock to Ernest M. Hill of Buffalo, New York, valued at $4,000 a share. The respondent increased this value to $7,600 a share. He further advised that petitioner had neglected to report gifts of 12 shares to 12 individuals and that these shares had been valued at $7,600 a share. The parties were not in agreement that the disposition of these 12 shares were actually gifts but now petitioner has stipulated that they were so in fact and that the only question is their value. The respondent further determined that the trust created by petitioner in September 1940 was insufficient to shield him from tax upon its income and since the income of the trust had been distributed to the beneficiaries, it was a taxable gift. We so hold. Our only remaining problem is to determine the value of the Process Company's stock. The statute reads as follows: SEC. 1005. GIFTS MADE IN PROPERTY. If the gift is made in property, the value thereof at the date of the gift shall be considered the amount of the gift. Nowhere in the evidence or stipulation do we find the exact date in 1940 that the *125 gifts were made. Respondent states in his brief that they were made in September 1940. Petitioner states in his brief that the gifts were made on September 24, 1940, the date the trust was created. In view of such statements we adopt the latter date as that of the gifts. We think that the exact date is especially important due to the Circuit Court of Appeals' vacating order of September 20, 1940, since that order no doubt must have had a depressing effect on the market value of Process Company stock. During the first 20 days of September, in the words of petitioner, Process Company "had a claim against everybody in the country." The Carnegie-Illinois Steel Company had settled its litigation by the payment of $3,850,000 and had promised to pay a minimum future royalty of $1,000,000. Other steel companies were to have an opportunity to settle on the same terms. The validity of the patents had been upheld and nothing remained but to work out settlement agreements with the other steel companies and collect royalties during the life of the patents. The prospects for the future of the Process Company during that period were bright. On September 9, 1940, Bliss, Beeghly and Kilcawley sold *126 40 shares of their Process Company stock to Standard Slag Company at a price of $7,600 a share. It was this sales price that respondent used as a basis to compute the value of the stock both in 1940 and 1941. In spite of the presumption we are required to give respondent's determination, and the comparatively bright future for the stock on that date we think too much stress was laid by him on this transaction. We are of the opinion that the intimate relationship between Bliss Beeghly and Kilcawley and the Standard Slag Company was an important factor in arriving at a sales price of $7,600 a share. The respondent's witness, the auditor of Standard Slag Company, testified that the indebtedness of these men to the company was a factor in arriving at the sales price. He further testified that this indebtedness was repaid immediately after the sale. As illustrative of the dealing of these men with Standard Slag Company and not with any attempt to set a price in the light of subsequent events, we can only point out that in December 1942 these men sold some Process Company stock to Standard Slag at $5,000 a share, at a time when the outlook for the stock was, to say the least, rather dark. *127 In October, 1940 they had rejected petitioner's offer to sell them or their nominee his shares at $4,000. We think this is important as sustaining petitioner's contention that the intimate relationship of Beeghly, Bliss and Kilcawley and Standard Slag Company had a definite bearing on the sales price. They were in full control of it as stockholders, directors and officers. We do not think, under the circumstances, that Standard Slag Company was in a position to, or did, exercise an independent volition therein. Petitioner argues impressively that this was not a bona fide sale and the transaction between the Standard Slag Company and Beeghly, Bliss and Kilcawley was merely a shifting of funds from one pocket to another. We think that the circumstances surrounding the transaction can not be ignored in determining the value of the stock and we have found that it was not an arm's length transaction. Another important factor in this sale was the favorable tax situation. The shares were valuable only as a source of income from the royalties on the patents. The remaining assets of the Process Company were relatively unimportant. The income to Standard Slag Company by way of dividends from *128 the Process Company would be taxed considerably less than the same income to an individual. The Supreme Court of the United States had denied certiorari in the Carnegie-Illinois Steel Company case on February 26, 1940. On several occasion after that date petitioner sold shares of stock for $500 a share plus one-half of the excess over that price in the event of a resale thereof. Although the Steel Company had not actually concluded its settlement agreement, it was only a matter of time before it would be forced to make some sort of adjustment with the Process Company. Respondent contends that these were not sales but "dispositions." It is true that such transactions disclosed no determinable amount which petitioner might ultimately receive for the stock involved but they do indicate arm's length transactions at a stated price of $500 plus only a contingent speculative additional amount to petitioner. These buyers acquired an equity in the shares which could be and later was enforced. The consideration paid was some indication of the sale value of the shares between persons of independent volitions. The offer of petitioner to sell some shares to Beeghly, Bliss and Kilcawley, *129 or their nominees, at $4,000 in October, 1940 and their rejection thereof are significant even though the offer was made after most of the gifts were completed. The unwillingness of the three men to purchase these shares whereby they would rid themselves of petitioner whom they apparently regarded as a troublemaker, in addition to buying the stock, is important as indicating that in an arm's length transaction their estimate of the value of the stock at that time was less than $4,000 per share. The state of the relations existing between petitioner and these men at this time is not revealed but we can assume that all of them remembered his pugnacious activities on behalf of the minority stockholders of the Process Company. The Carnegie-Illinois Steel Company settlement was a compromise of prior earnings. Respondent's witness testified that dividends for 1940 were estimated from $1,000 to $1,500 and future "substantial dividends for the life of the patents." He also stated that future earnings must be discounted somewhat because of the fact that the patents were a wasting asset. The liquidating value of the stock, exclusive of the patents, is not disclosed but respondent's witness *130 testified that liabilities exceeded current assets both in 1940 and 1941. We think petitioner has established that the value determined by respondent is erroneous. However, he has not demonstrated to our satisfaction what was the actual value of this stock. We can, therefore, only approximate the value after studying all the evidence, including the balance sheets, future earnings, the effect of future litigation and all other pertinent facts. After considering the potential earnings as of the various dates in question, the sales and offers made in connection with this stock, as well as other factors herein mentioned, we have found that the value of the Process Company stock on the date of the gifts in September 1940 was $4,000 a share. The gift to Hill was made in December 1940 and petitioner valued it at $4,000 a share, even though his offer in October to sell at that price had been rejected. There is nothing in the record to indicate that the market value of the stock had changed since that time. Inasmuch as petitioner was familiar with the value of the stock and he placed a value on it for gift purposes at $4,000, we are inclined to agree with his figure. We have found that the *131 value of the shares on the date of the gift in December 1940 was likewise $4,000 a share. We now turn to the value of this stock in December 1941. The dates of the gifts are shown as December 24 and December 29, 1941, respectively. Since there is nothing to indicate that the values might have changed in this period we shall proceed on the assumption that the values are identical. Respondent determined the value of the stock at this time at $6,275. This was computed on the sales price of $7,600 in September 1940 less dividends paid of $1,325. In December 1941 none of the steel companies had taken advantage of their chance to work out a compromise with the Process Company. It was apparent that any future royalties and resulting dividends for stockholders would have to be collected by litigation, which could conceivably last the life of the patents. Petitioner testified that at that time the stock was not worth over $1,000 a share. He arrived at this price by totaling future dividends at $1,800, adding $200 as the liquidating value of the shares and dividing this sum by 2 because of the higher tax rate. We can not go along with petitioner on his theory that every purchaser for this *132 stock was in the 50 percent surtax bracket. We think some allowance should be made and have taken that into consideration in arriving at a value. We have held that the respondent's value of $7,600 for 1940 was excessive in the amount of $3,600 per share. Other facts tend to further reduce the value in December 1941. We have considered these in arriving at a value as of December 1941 and determine that value to be $2,000 a share. Decision will be entered under Rule 50. Footnotes
1. SEC. 22 GROSS INCOME. (a) General Definition. - "Gross income" includes gains, profits, and income derived from salaries, wages, or compensation for personal service, of whatever kind and in whatever form paid, or from professions, vocations, trades, businesses, commerce, or sales, or dealing in property, whether real or personal, growing out of the ownership or use of or interest in such property; also from interest, rent, dividends, securities, or the transaction of any business carried on for gain or profit, or gains or profits and income derived from any source whatever. * * *↩